UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DONNA L. TOWNSEND,

                         Plaintiff,

  -against-                                                5:17-CV-0583 (LEK)

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                         Defendant.

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

On July 16, 2013, plaintiff Donna Townsend applied for supplemental security income ("SSI"), alleging a disability onset date of January 30, 2009. Dkt. No. 10 ("Transcript") at 147. The Social Security Administration ("SSA") initially denied her claim on September 19, 2013. Id. at 61. Administrative Law Judge ("ALJ") Elizabeth Koennecke held a hearing regarding Plaintiff's SSI eligibility on February 24, 2015, and, on March 24, 2015, issued a decision finding that Plaintiff was ineligible for SSI because she was not disabled within the meaning of the Social Security Act. Id. at 12, 15.

Plaintiff appealed the ALJ's decision, and the SSA's Appeals Council denied review of the decision on April 19, 2017. Id. at 1–3. On May 24, 2017, Plaintiff filed an action in this Court pursuant to 42 U.S.C. § 405(g) challenging the ALJ's decision. Dkt. No. 1 ("Complaint"). Both parties have filed briefs. Dkt. Nos. 11 ("Plaintiff's Brief"), 16 ("Defendant's Brief"). For the reasons that follow, the ALJ's judgment is remanded for further proceedings.

## II. BACKGROUND

### A. Plaintiff's Medical Records

On July 20, 2011, Dr. Richard Levy performed an x-ray on Plaintiff that revealed degenerative "changes of the thoracic spine." Tr. at 239.

On October 26, 2011, Dr. Jorge Davidenko took Plaintiff's blood pressure, which was 240/115. Id. at 247. Dr. Davidenko sent Plaintiff to the ER to treat her "severe uncontrolled hypertension." Id. There, Plaintiff was administered nitroprusside through an IV, which helped control her blood pressure. Id. at 244. The ER physician, Dr. Vinod Garg, started Plaintiff on a prescription for hydrochlorothiazide, 25 mg/day. Id. On October 28, Plaintiff was discharged from the ER; her blood pressure had fallen to 132/66. Id.

On March 13, 2012, Dr. Ronald Karo took an x-ray of Plaintiff's chest, and learned that her lungs were hypoventilated, she had an enlarged heart, and that she had "[m]oderate" degenerative changes in her mid-dorsal spine. Id. at 261.

On March 7, 2013, Dr. Andrea Rothe took an x-ray of Plaintiff's lumbar spine, and found "no fracture or dislocation" but "[m]ild degenerative change." Id. at 343.

On April 2, 2013, Plaintiff met with Dr. Danita Fox, and reported that she had suffered back pain for a month. Id. at 295. Plaintiff stated that her pain traveled to her left leg, and that it became "aggravated by descending stairs, sneezing and walking." Id. Plaintiff relieved the pain by resting and taking ibuprofen. Id. Fox concluded that Plaintiff had "[n]ormal mobility" in her cervical and thoracic spine, "[f]ull range of motion" in her knees, and "[p]araspinal muscle tenderness." Id. at 297. Dr. Fox also observed that Plaintiff had high blood pressure. Id. at 297.

On April 11, 2013, Plaintiff met with Dr. Fox once more to receive treatment for her hypertension and to discuss her back pain. Id. at 300. Plaintiff's blood pressure was 209/125 in her left arm and 222/125 in her right. Id. During this meeting, Plaintiff described her back pain as a "9/10" on the pain scale. Id. at 301.

From May to July 2013, across seven visits with three doctors, Plaintiff sought treatment for hypertension. Id. at 285–86, 289, 305–07, 310, 313, 315, 318, 320, 323, 329–31, 333, 336. Plaintiff was started on numerous prescription medications for her blood pressure during this period, including Lisinopril, chlorthalidone, Metoprolol, Labetalol, and nitroglycerin patches. Id. at 289, 307, 313, 323. During this period, she was intermittently compliant with these medications, id. at 305–06, 315. Plaintiff's blood pressure fluctuated over these three months, from a high of 240/144 during her meeting with Dr. Fox on July 8, id. at 323, to a low of 162/98, as reported by Plaintiff at her July 22 meeting with Dr. Fox, id. at 329. Plaintiff's back pain was intermittently present during this period. Id. at 305, 310, 315 (no back pain), 333 (back pain).

On August 6, 2013, Plaintiff met with Dr. Fox, and described her back pain as a "9/10." Id. at 338. During this meeting, Dr. Fox studied an x-ray of Plaintiff's spine from March 2013, which showed degenerative joint disease. Id. Dr. Fox also noted that Plaintiff exhibited "paraspinal muscle tenderness" and "moderate pain" when Plaintiff moved the region surrounding her lumbar spine. Id. at 340. Dr. Fox refilled Plaintiff's Flexeril prescription, advised Plaintiff against taking Aleve for her back pain, and recommended physical therapy. Id. at 341. Plaintiff stated that she did not want to do physical therapy, both because she did not find it useful when she had tried it in the past and because of an "insurance issue." Id.

Between November 25, 2013 and February 24, 2014, Plaintiff met with Dr. Pawan Rao eleven times for hypertension treatment. Id. at 967–992. During this time, Dr. Rao decreased Plaintiff's amlopidine dosage, prescribed hydralizine, added a different nitroglycerin patch prescription, increased her Labetalol prescription, and added a minoxidil prescription. Id. at 970, 973, 982, 984, 988–91, 993. During this period, Plaintiff's blood pressure ranged from a low of 133/84 on December 23, 2013, id. at 984, to a high of 182/109 on February 10, 2014, id. at 970.

During Plaintiff's January 13, 2014 meeting with Dr. Rao, he diagnosed her with type 2 diabetes after inspecting lab results. Id. at 976. To treat her diabetes, he wrote Plaintiff a Metformin prescription. Id.

On February 26, 2014, Plaintiff went to the ER, reporting "shortness of breath," "wheezing for several days," and "trouble . . . walking." Id. at 434. Plaintiff was "mildly hypoxic," and her chest x-ray "showed cardiomegaly." Id. After receiving "two liters of IV fluids," Plaintiff's symptoms did not completely abate. Id. Following a cardiac consultation the following morning with Dr. Davidenko, Plaintiff was transferred to St. Joseph's Hospital to receive cardiac catheterization. Id. at 441.

On March 4, 2014, Plaintiff met with physician assistant John Stulb, who reported that Plaintiff's blood pressure was 183/132. Id. at 423. Plaintiff told Stulb that her cardiac catheterization came back negative. Id. at 425. During this meeting, Plaintiff stated that she had no back pain, joint pain, muscle weakness, or stiffness. Id.

On March 10, 2014, Plaintiff met with Dr. Rao, who observed that Plaintiff had "mild coronary artery disease." Id. at 965. Dr. Rao discontinued Plaintiff's minoxidil prescription and increased her aldactone prescription to 200 mg/day. Id.

4

On April 18, 2014, Plaintiff met once more with Dr. Rao, reported that she was suffering from back pain, and said that her primary care physician had prescribed Tramadol to help treat the pain. Id. at 958. Her blood pressure at this visit was 153/94. Id. at 959. Dr. Rao prescribed Lasix to help control Plaintiff's hypertension. Id.

On May 16, 2014, Plaintiff met with Dr. Cherilyn White. Id. at 412. Plaintiff's blood pressure had improved—it was recorded at 124/86—but she described the pain in her right shoulder and in her back as a "9/10." Id. at 413. Dr. White observed that Plaintiff's gait and station were normal, that her back exhibited no tenderness, that her right shoulder joint was "[t]ender with internal rotation," but that the range of motion in her shoulder was "mostly normal." Id. at 416.

On May 23, 2014, Dr. Andrew Lewis took an x-ray of Plaintiff's cervical spine, which revealed "no acute fracture or spondylolisthesis," but did reveal "moderate degnerative changes." Id. at 411.

Plaintiff visited Dr. Polly Cator four times between June 4, 2014, and July 9, 2014, to receive trigger point injections to treat her shoulder pain. Id. at 390, 587–90. At the July 9 meeting, Dr. Cator observed that Plaintiff was "able to put her hands behind her neck and behind her low back," and that her "[j]oints appear stable." Id. at 590. However, she also noted that Plaintiff's "[o]verhead reach is voluntarily limited," and that her "[p]assive overhead reach is full with reported pain." Id. Dr. Cator discontinued the trigger point injection treatment during this meeting because it did not appear to be reducing Plaintiff's shoulder pain. Id.

On June 26, 2014, Plaintiff met with Dr. White, and reported that she attempted to overdose on her medications. Id. at 402. Dr. White diagnosed Plaintiff with depression, and

5

noted that Plaintiff's "safety plan is to have [her] boyfriend . . . manage medications," and that Plaintiff "has increased counsellor [sic] visits as well." Id. at 404.

At Plaintiff's July 14, 2014 visit with Dr. Rao, she indicated that she was "[w]alking daily" and "has lost some weight." Id. at 953.

On August 5, 2014, Plaintiff was taken to the ER after police responded to a domestic disturbance between Plaintiff and her boyfriend, and Plaintiff told the police that she "plan[ne]d to overdose on her pills." Id. at 516. At the ER, Plaintiff stated "that she receives counseling at the Cortland County Mental Health Clinic," and "that she has had inpatient psychiatric stays and suicide attempts in the past." Id. Kelley Serens, the family nurse practitioner who examined Plaintiff at the ER, reported that Plaintiff was "intermittently belligerent and aggressive verbally." Id. at 517. Before Plaintiff's discharge from the ER, Dr. Russell Firman examined Plaintiff and diagnosed her with adjustment disorder and depression. Id. at 518.

On December 31, 2014, Plaintiff met with Joanne Bigness, a psychiatrist, at Cortland County Mental Health Clinic. Id. at 595. Bigness described Plaintiff as "alert" and with an "appropriate" "[a]ffect," and stated that Plaintiff's "[j]udgment is fair" and that her "[a]ttention/[c]oncentration is characterized by ability to attend and maintain focus." Id. Furthermore, Bigness stated that Plaintiff did not exhibit impulse control issues, was "[l]ogical and coherent," and was "[c]ooperative and friendly with good eye contact and interaction." Id. Plaintiff, who by this time had received prescriptions for fluoxetine and Xanax, stated that she was "doing much better with her mood and anxiety," denied having suicidal ideations, and "[r]ate[d] her depression and anxiety both a 3/10." Id. Plaintiff also revealed that she was seeing

6

a therapist. Id. Bigness diagnosed Plaintiff with major depressive disorder, post-traumatic stress disorder, and borderline personality disorder. Id.

### B. Dr. Ganesh's Consultative Examination

On September 3, 2013, after applying for SSI, Plaintiff was referred by the Division of Disability Determination to Dr. Kalyani Ganesh for a consultative examination. Tr. at 384. Plaintiff reported to Dr. Ganesh that her boyfriend does all the house chores, and that "[s]he can shower once or twice a week, [and] dress daily." Id. at 385. Dr. Ganesh described Plaintiff's gait and station as "normal," but observed that she "[c]annot walk on [her] heels and toes," and that she could not squat. Id. at 385. Plaintiff "[n]eeded no help changing for the exam or getting on and off the exam table," and she was "[a]ble to rise from [the] chair without difficulty." Id. at 386. Dr. Ganesh found that Plaintiff had no pain or "trigger points" in her cervical spine, that she had full range of motion in her shoulders and elbows, but that she could not "do extension" of her thoracic and lumbar spines. Id. Dr. Ganesh diagnosed Plaintiff with uncontrolled hypertension, asthma, arthritis, high blood pressure, and a history of kidney stones. Id. Dr. Ganesh concluded that Plaintiff had "no gross physical limitation . . . [with] sitting, standing, walking, or the use of [her] upper extremities." Id. at 387.

### C. ALJ Hearing

On February 24, 2015, ALJ Koennecke held a hearing regarding Plaintiff's SSI eligibility. Tr. at 32. Plaintiff testified to the following at the hearing. Plaintiff worked as a janitor from 2006 until she was laid off in 2009. Id. at 37. As a janitor, Plaintiff was required to lift up to twenty pounds. She also had to stand and walk to perform tasks like restocking the bathrooms' toilet paper and paper towels. Id.

Plaintiff has poor balance and sometimes feels dizzy. Id. at 35. Furthermore, her arthritis is severe and makes it "hard for [her] to walk." Id. at 42. Plaintiff stated that her boyfriend performs all household chores because she "can't hold on to stuff," id. at 43, but later stated that she performs chores like dish washing and grocery shopping, id. at 44. Plaintiff occasionally walks for around thirty minutes to her medical appointments, although she requires someone to walk with her because of her poor balance and occasional lightheadedness. Id. at 45. Plaintiff is able to stand for "30 minutes or more" before needing to sit down, and she is able to sit for thirty minutes before standing. Id. at 45. Plaintiff is able to lift a maximum of ten pounds. Id. at 45. Her back hurts when she bends over at the waist, and she cannot squat because it puts pressure on her knees. Id. at 46.

Plaintiff also stated that she is "suicidal," and that her psychiatrist had recently increased the dosage of her antidepressant medication because the lower dosage "wasn't working." Id. at 39–40. She also stated that she has "tried to cut [her] wrist," and that her depression sometimes makes it difficult to leave the house. Id. at 48–49.

**D. The ALJ's Decision**

On March 24, 2015, ALJ Koennecke issued a decision finding that Plaintiff was not disabled since July 16, 2013, the date Plaintiff filed her SSI application. Id. at 15.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 16, 2013. Id. at 17.

Second, the ALJ found that Plaintiff's severe impairments included hypertension, obesity, and asthma. Id. The ALJ determined that, although the record reflected that Plaintiff had been diagnosed with "diabetes mellitus, headaches, hypothyroidism, cervical spine degenerative disc

disease, and lumbar spine degenerative joint disease," these impairments were not severe because the record contained "no evidence to support any functional restrictions that have been imposed based on any of these alleged conditions." Id.

The ALJ also found that Plaintiff's "mental impairment" was not severe. Id. The ALJ determined that Plaintiff's mental impairment (1) did not impose any limitations on Plaintiff's "activities of daily living"; (2) did not impact Plaintiff's "social functioning"; (3) did not limit Plaintiff's "concentration, persistence or pace"); and (4) did not result in any "extended psychiatric hospitalizations or other extended periods of a loss of adaptive functioning." Id. at 19.

Third, the ALJ found that Plaintiff did not have "an impairment or combination of impairments that meets or equals the severity of" any of the impairments listed in relevant federal regulations. Id. at 20.

Fourth, the ALJ considered Plaintiff's symptoms and their impact on her "residual functional capacity" ("RFC"), and determined that Plaintiff was capable of "lift[ing] and carry[ing] up to 20 pounds occasionally and 10 pounds frequently, sit[ting] for six hours in an eight-hour workday, and stand[ing]/walk[ing] for six hours in an eight-hour workday." Id. The ALJ noted that Plaintiff "should avoid exposure to respiratory irritants." Id.

Finally, the ALJ determined that, given Plaintiff's prior work experience as a janitor and her RFC, she was capable of working as a janitor. Id.

Based on these findings, the ALJ concluded that Plaintiff was not disabled for purposes of the Social Security Act. Id. at 24.

## III. LEGAL STANDARD

### A. Standard of Review

When the court reviews the ALJ's decision, it determines whether the ALJ applied the correct legal standards and if his decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the ALJ's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support his decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare,

463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the ALJ is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. Id.

At step one, the ALJ considers a claimant's current work activity to see if it amounts to "substantial gainful activity." § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the ALJ considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in § 404.1509. § 404.1520(a)(4)(ii). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the ALJ considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in § 404(P), Appendix I. § 404.1520(a)(4)(iii). If it does not, the ALJ moves on to step four to review the claimant's RFC and past relevant work. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform her past relevant work, the ALJ decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. § 404.1520(a)(4)(v). If appropriate work does not exist, then the ALJ considers the claimant to be disabled. Id.

## IV.   DISCUSSION

Plaintiff asserts two errors in the ALJ's decision: (1) the ALJ improperly relied on Dr. Ganesh's medical opinion when determining the severity of Plaintiff's physical disabilities and computing her RFC; and (2) the ALJ improperly concluded that Plaintiff's depression was not a severe impairment without further developing the record. Pl.'s Brief at 20–23.

### A. Reliance on Dr. Ganesh's Opinion

Plaintiff claimed that the ALJ was not entitled to accord significant weight to Dr. Ganesh's opinion because his opinion was internally inconsistent. Pl.'s Brief at 20–22.

Dr. Ganesh, Plaintiff's consultative examiner, concluded that Plaintiff had "no gross physical limitation . . . [with] sitting, standing, walking, or the use of [her] upper extremities." Id. at 387. The ALJ gave Dr. Ganesh's opinion "full weight," stating that the "opinion was rendered after a thorough examination by a physician with extensive program and professional expertise," and was "unrebutted by any other opinion evidence of record." Id. at 22.

Plaintiff complains that Dr. Ganesh's opinion is inconsistent because he observed "that Plaintiff could not walk on her heels and toes and could not squat," but then "opine[s] that Plaintiff has no physical limitations." Id. at 20 (citing Tr. at 385–86). Consequently, Plaintiff argues, the ALJ, by improperly giving Dr. Ganesh's opinion full weight, "has not properly weighed the evidence, thus resulting in an RFC not supported by substantial evidence." Id.

"In the Second Circuit, the ALJ is entitled to rely upon the opinions of consultative examining physicians, as they may constitute substantial evidence if the administrative record supports them." Byrne v. Berryhill, 284 F. Supp. 3d 250, 259–60 (E.D.N.Y. 2018) (citing Rosier v. Colvin, 586 F. App'x 756, 758 (2d Cir. 2014)). "An ALJ is permitted to accord greater weight

12

to a consultative examiner's opinion if the conclusions are more consistent with the medical evidence." Id. at 260.

The Court concludes that Dr. Ganesh's opinion regarding Plaintiff's physical disabilities was not inconsistent with his observations, and that the ALJ therefore did not err by relying on Dr. Ganesh's opinion when determining the severity of Plaintiff's physical disabilities and constructing her RFC. Contrary to Plaintiff's assertion that Dr. Ganesh "opine[d] that Plaintiff has no physical limitations," Pl.'s Brief at 20, Dr. Ganesh concluded that Plaintiff had no "*gross* physical limitation . . . [with] sitting, standing, walking, or the use of [her] upper extremities," Tr. at 387 (emphasis added). This opinion is clearly supported by Dr. Ganesh's observations. During the consultative examination, Plaintiff told Dr. Ganesh that she showers multiple times a week and dresses herself daily. Tr. at 385. Moreover, Dr. Ganesh observed that Plaintiff was able to change for the exam, "get[] on and off the exam table," and "rise from [the] chair without difficulty." Id. at 386. He also noted that Plaintiff's gait and station were "normal," that she had no pain in her cervical spine, and that she had full range of motion in her shoulders and elbows. Id. In addition to these positive observations, Dr. Ganesh noted that Plaintiff could not walk on her heels and toes, that she could not squat, and that she could not extend her thoracic and lumbar spines. Id. at 385–86. His conclusion that Plaintiff had "no gross physical limitation . . . [with] sitting, standing, walking, or the use of [her] upper extremities," id. at 387, is, therefore, not inconsistent with the observations he made during the examination.

Furthermore, the ALJ was entitled to give full weight to Dr. Ganesh's opinion because his conclusion was generally consistent with the record. See 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will

13

give to that medical opinion."). As the ALJ noted, Dr. Ganesh's opinion was "unrebutted by any other opinion evidence of record." Tr. at 22. Moreover, the diagnostic evidence in the record comports with Dr. Ganesh's conclusion that Plaintiff's physical limitations did not significantly impact her gait and station, the range of motion in or the strength of her extremities, or her balance. E.g., id. at 297 (concluding that Plaintiff had "[n]ormal mobility" in her cervical and thoracic spine, and "[f]ull range of motion" in her knees), 305–15 (noting that Plaintiff was not experiencing back pain during three examinations in 2013), 343 (finding "no fracture or dislocation" in Plaintiff's lumbar spine and "[m]ild degenerative change"), 416 (reporting that Plaintiff's gait and station were normal, that her back exhibited no tenderness, and that the range of motion in Plaintiff's shoulders was "mostly normal"), 425 (reporting, during a March 2014 examination, that Plaintiff was not experiencing any back pain, joint pain, muscle weakness, or stiffness).

In addition to diagnostic evidence, Dr. Ganesh's opinion is also consistent with numerous statements that Plaintiff made regarding her daily activities. For instance, Plaintiff indicated that she lost her job as a janitor in 2009 because she was laid off, not because of her physical disability. Tr. at 37. Plaintiff also stated that she regularly washes the dishes in her home, goes grocery shopping, and walks for around thirty minutes to her medical appointments. Id. at 34–45. Furthermore, in December 2014, Plaintiff reported to her psychiatrist that she provided daily assistance to her grandmother, who was recovering from a broken hip. Id. at 595. As the ALJ noted in her decision, these activities require Plaintiff to exert herself in a manner that suggests that her physical limitations are not significantly limiting. Id. at 22.

Finally, while Plaintiff cites limited portions of the record that suggest that she has intermittent back pain and poor balance, Pl.'s Brief at 21 (citing Tr. at 239, 261, 297, 301, 336, 341, 343, 958), the question before the Court is whether substantial evidence supports the ALJ's decision, not whether any evidence supports Plaintiff's position, Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013). Furthermore, most of the evidence Plaintiff cites to support her argument that her physical disabilities are significantly limiting comes not from diagnostic evidence, but from complaints she made about her back pain and poor balance to her physicians and from her hearing testimony. Pl.'s Brief at 21. The ALJ did not ignore this evidence. Rather, the ALJ appropriately found that Plaintiff's statements regarding her disability lacked credibility after comparing these statements to diagnostic evidence that, as stated above, suggested that Plaintiff's physical disabilities were not significantly limiting. Tr. at 21–22. See also 20 C.F.R. § 404.1521 ("We will not use your statement of symptoms . . . to establish the existence of impairment(s).").

For the above reasons, Dr. Ganesh's opinion regarding Plaintiff's physical disability was consistent with the observations he made during the consultative examination, and consistent with the record as a whole. Accordingly, Dr. Ganesh's opinion constitutes substantial evidence in support of the ALJ's findings regarding the severity of Plaintiff's physical disabilities and the ALJ's determination of Plaintiff's RFC.

**B. Consideration of Plaintiff's Mental Impairments**

Plaintiff argues that insufficient evidence supports the ALJ's position that Plaintiff did not have severe mental impairments, and that the ALJ was obligated to further develop the record with regard to this issue. Pl.'s Brief at 22.

As stated above, at step two of the benefits evaluation process, the ALJ must determine whether the claimant's physical or mental impairments are severe. 20 C.F.R. § 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." § 404.1522(a).

To evaluate the severity of a claimant's mental impairment, the ALJ must analyze the impairment's impact on "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Coyle v. Comm'r of Soc. Sec., No. 17-CV-924, 2018 WL 3559073, at *4 (N.D.N.Y. July 24, 2018) (citing § 404.1520a(c)(3)). If the ALJ concludes that the claimant's degrees of limitation in these functional areas are nonexistent or mild, the impairment is not considered severe. Id. (citing § 404.1520a(d)(1)).

Finally, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citing Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). "This duty exists even when the claimant is represented by counsel." Id.

Numerous doctors who examined Plaintiff diagnosed her with depression, adjustment order, and major depressive disorder. Tr. at 404, 518, 596. However, the Court finds that the ALJ appropriately concluded that Plaintiff's mental impairments did not significantly impact three of the four functional areas described above: activities of daily living; concentration, persistence, or pace; and episodes of decompensation. Tr. at 18–19. Regarding the "activities of daily living"

16

category, Plaintiff was capable of shopping for groceries, bathing, washing dishes, dressing herself, assisting her elderly grandmother, and walking to and from her medical appointments. Tr. at 34–45, 595. This supports the ALJ's conclusion that Plaintiff's mental impairment caused either no limitation or a mild limitation of activities of daily living. Tr. at 18; see Petrie v. Astrue, 412 F. App'x 401, 409 (2d Cir. 2011) (affirming that substantial evidence supported the ALJ's finding of no severe impairment where "[e]vidence in the record consistently showed that [the plaintiff] was able to dress, bathe, and groom himself on a daily basis," and where he was able to "perform general cleaning, laundry, and shopping").

Regarding Plaintiff's "concentration, persistence, or pace," the record provides no indication that Plaintiff had any limitations in this area. During a December 2014 examination, Dr. Bigness, Plaintiff's psychiatrist, concluded that Plaintiff exhibited "[n]o evidence of mania or psychosis," she did not experience any hallucinations, she "verbalize[d] partial awareness of problems," her "[j]udgment [was] fair," she had the "ability to attend and maintain focus," she had no "impulse control issues," and her "[t]hought [p]rocess was "[l]ogical and [c]oherent." Tr. at 595. This supports the ALJ's conclusion that Plaintiff's mental impairment caused either no limitation or only a mild limitation of her concentration, persistence, or pace. Id. at 19.

Regarding "episodes of decompensation," "decompensation" is defined "as an 'exacerbation[] or temporary increase[] in symptoms or signs accompanied by a loss of adaptive functioning.'" Wood v. Colvin, 987 F. Supp. 2d 180, 191 (N.D.N.Y. 2013) (quoting § 404.1520a). For purposes of evaluating the severity of a mental impairment, the episodes of decompensation must be "of extended duration, . . . each lasting for at least [two] weeks." Id.

(quoting § 404.1520a). The record contains no evidence that Plaintiff suffered a single episode of decompensation for a period of at least two weeks.

However, the Court finds that the ALJ erred by not further developing the record before determining that Plaintiff had no limitations in social functioning. At the hearing before the ALJ, Plaintiff stated that she had no friends that she visited, and that "[t]he only thing [she] do[es] is go to [her] appointments and then back home." Tr. at 47. She also stated that depression makes her "end up arguing with [her] boyfriend." Id. at 48. When asked how depression "impact[s] what [she is] able to do," Plaintiff stated, "Well, there's times I get so depressed, I don't want to leave the house. I don't want to go anywhere. I just want to sit home and when I do that, that's when . . . I call my counselors because then they know that I'm either going to hurt myself or do something to somebody else." Id. at 47–48.

The ALJ concluded that Plaintiff's depression did not limit her "social functioning" because a psychiatrist described Plaintiff's demeanor at an appointment as "open and cooperative with no evidence of mania or psychosis and good eye contact." Id. at 18. However, the ALJ failed to consider evidence that Plaintiff stated that she has no friends, that her depression causes her to argue with her boyfriend, or to consider that her occasional inability to leave the home suggests a possibly severe lack of social functioning. See Smith v. Comm'r of Soc. Sec., No. 10-CV-176, 2011 WL 6372792, at *8 (D. Vt. Dec. 20, 2011) (finding that the ALJ committed legal error by concluding that the plaintiff had "only 'moderate' difficulties in social functioning" without evaluating "the evidence that [the plaintiff] had poor relationships with family members, difficulties in her relationship with her boyfriend, [and] no friends other than her boyfriend").

For these reasons, the Court concludes that substantial evidence does not support the ALJ's determination that Plaintiff had either no limitation or only a mild limitation with regard to social functioning. Development of the record is required to determine the impact of Plaintiff's mental impairments on her social functioning. Defendant asserts that the ALJ's decision that Plaintiff's mental impairments were not severe was, at most, harmless error, explaining that the ALJ considered the effects of Plaintiff's mental impairments throughout the remainder of the five-step analysis. Def.'s Brief at 7. However, this is plainly incorrect—the ALJ made no mention of Plaintiff's mental impairments after concluding that the impairments were not severe. Tr. at 19–24. Accordingly, the matter is remanded to the Commissioner for specific findings regarding the degree to which Plaintiff's mental impairments limit her social functioning.

V.     **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that this case is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order, pursuant to Sentence Four of 42 U.S.C. § 405(g); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     August 30, 2018
                Albany, New York

Lawrence E. Kahn
U.S. District Judge